# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                  No. 3:25-cr-37-BJB

ROBERTO DIAZ-JARQUIN

**\* \* \* \* \***

### OPINION REGARDING DENIAL OF MOTION TO DISMISS

Roberto Diaz-Jarquin, the Defendant in this single-count gun prosecution, is a citizen of Mexico. But he's lived in this country since childhood, when his parents illegally entered the United States and brought him along. *See* Motion to Dismiss (DN 14) at 2; Response (DN 17) at 1. In 2013, Diaz-Jarquin enrolled in the DACA ("Deferred Action for Childhood Arrivals") program. This led the Department of Homeland Security to officially defer his removal from the country. Since his enrollment, however, Diaz-Jarquin allegedly collected six rifles and ammunition. Indictment (DN 1) at 1. According to an arrest report that Diaz-Jarquin doesn't challenge here, Louisville police found these weapons, plus drugs and paraphernalia, in his home. DN 17-1 at 2. After Diaz-Jarquin pled guilty to state drug charges, *see* Response at 2, a federal grand jury indicted him for unlawfully possessing a firearm as "an alien … illegally or unlawfully in the United States," *see* 18 U.S.C. § 922(g)(5).[1]

Invoking the Supreme Court's decisions in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), Diaz-Jarquin contends that the Second Amendment bars his prosecution. Because "[t]he historical record does not support a categorical ban on firearm possession by noncitizens," Motion to Dismiss at 13, their disarmament under § 922(g)(5) is unconstitutional—both on its face and as applied. *See also id.* at 17.

---

[1] 8 U.S.C. § 1101(a)(3) defines "alien" to mean "any person not a citizen or national of the United States." And 18 U.S.C. § 922(y)(1) defines "alien" the same way by giving it "the same meaning as in" § 1101(a)(3), at least in as used in "this subsection." Although neither provision directly controls the meaning of "alien" under § 922(g)(5), the parties and the statutory scheme give no reason to suspect any material difference in the definition as the term is used in § 922(g)(5).

History and precedent, however, indicate that Congress does have lawful authority to disarm aliens in Diaz-Jarquin's position.  So his motion to dismiss fails.

**\* \* \***

The Second Amendment codified "the right of the people to keep and bear Arms."  This right is an "individual" one, which predates the founding and the Bill of Rights.  *District of Columbia v. Heller*, 554 U.S. 570, 592, 595 (2008).  The protection it affords today, like that afforded by other constitutional rights, depends on "the scope of that right … at the time of the founding."  *Bruen*, 597 U.S. at 25 (quotation marks omitted).  To determine whether a particular government action abridges that right, courts ask whether "the Second Amendment's plain text covers an individual's conduct," and if so whether the government's regulation "is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 24.

As for the text, judges have divided on the question whether aliens are among "the people" protected by the Second Amendment.  That's true both before and since the Supreme Court's pathmarking decision in *Bruen*.  Some decisions treated aliens as not among "the people" referred to in the Second Amendment.[2]  Meanwhile others concluded (or assumed) that these noncitizens were part of "the people" but nevertheless could lawfully be disarmed by Congress.[3]

The Sixth Circuit, however, still hadn't considered the question by the time Diaz-Jarquin filed his motion.  One unpublished decision, *United States v. Rangel-Tapia*, No. 23-1220, 2024 WL 966385, at \*3 (6th Cir. Mar. 6, 2024), held only that § 922(g)(5) could be applied, notwithstanding the Second Amendment, without plain error.  Because the question of § 922(g)(5)'s constitutionality remained open, the Government initially asked this Court to deny Diaz-Jarquin's motion on the ground that aliens categorically fall outside the people covered by the Second Amendment.  *See* Response at 2 (arguing that the Second Amendment's protections apply only to "law-abiding, responsible citizens") (quoting *Heller*, 554 U.S. at 635).

---

[2] *See United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012); *United States v. Portillo-Munoz*, 643 F.3d 437, 441–42 (5th Cir. 2011); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam); *United States v. Carbajal-Flores*, 143 F.4th 877, 882 (7th Cir. 2025) (among "the people"); *United States v. Vazquez-Ramirez*, 163 F.4th 706, 709 (9th Cir. 2026) (per curiam).

[3] *See United States v. Perez*, 6 F.4th 448, 452–53 (2d Cir. 2021); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012); *United States v. Torres*, 911 F.3d 1253, 1261–62 (9th Cir. 2019) (overruled in *Vazquez-Ramirez*); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670 (7th Cir. 2015) (abrogation recognized in *Carbajal-Flores*); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045–49 (11th Cir. 2022).

While his motion was pending, however, a divided Sixth Circuit panel rejected an argument similar to Diaz-Jarquin's. In *United States v. Escobar-Temal*, 161 F.4th 969 (2025), the majority held that at least some aliens enjoy the protection of the Second Amendment. Yet "the right to keep and bear arms," as historically understood, nonetheless allowed Congress to restrict at least some aliens' right to keep and bear arms. One judge disagreed, concluding that as a matter of "historical analysis," only "citizens who consented to the government of the United States" count among "the people." *Id.* at 986 (Thapar, J., concurring in the judgment and dissenting in part). Either way, all three Sixth Circuit judges agreed that Escobar-Temal's facial challenge to § 922(g)(5) failed.

And so does Diaz-Jarquin's: because at least some "alien[s] … unlawfully in the United States" may lawfully be disarmed, § 922(g)(5), a judge has no ground to treat Congress' enactment as a nullity. *See generally United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial "challenger must establish that no set of circumstances exists under which the Act would be valid"). Because § 922(g)(5) "survive[d] Escobar-Temal's facial challenge," it survives Diaz-Jarquin's too. *Escobar-Temal*, 161 F.4th at 984.

The as-applied challenge poses a trickier historical and doctrinal question. In at least some circumstances, *Bruen* and *Rahimi* and history make clear, the government may regulate firearm use and possession by "the people" who undoubtedly enjoy Second Amendment rights. To identify those circumstances, courts ask whether the measure is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

The Sixth Circuit held that Escobar-Temal's as-applied challenge failed because "a substantial history" exists "of governmental disarmament of noncitizens and other political or demographic groups seen as lacking a regulable relationship to the government." 161 F.4th at 978. This history, according to the majority opinion, reflected a principle that the "dangerous" groups could be disarmed. *Id.* at 981. And as with his facial challenge, this principle doomed Escobar-Temal's as-applied argument too: A group might be dangerous based on "violence already committed or even a tendency toward violence," *or* "because the group did not have a sufficient connection with the sovereign government." *Id.* Founding-era lawmakers disarmed groups like "Quakers" and "Catholic[s]" and loyalists and members of "Native American tribes, even those friendly with the colonists." *Id.* Not because they were necessarily violent, but because "danger could lie in a lack of sovereign control." *Id.* At the founding, in other words, governments could and did disarm members of groups "who were not loyal" to the government—either because they denied the sovereign's legitimacy, refused to swear loyalty oaths, or lacked legal relationships to the state. *Id.*

3

Among those who lacked such a "loyal" relationship, *Escobar-Temal* held, were aliens without permission to live in this country. "What was well established at the time of the founding … is the underlying concept that those who have no formal relationship with the government and who, therefore, cannot be appropriately regulated may be prohibited from possessing guns." 161 F.4th at 982. "And … there is a longstanding tradition of disarming noncitizens for precisely that reason." *Id.* at 983. "[W]hile unlawfully present individuals may have strong connections to the national community, their status inherently lacks a relationship with the United States government." *Id.* at 984.

This principle resolved Escobar-Temal's as-applied Second Amendment challenge. He had asked the Sixth Circuit to hold that "dangerousness" (and therefore disarmament) must be judicially determined on an individual, case-by-case basis. "[E]ven if individuals present in the United States unlawfully are dangerous as a class, members of that class should have the opportunity to prove that they are not dangerous, and that the law is, therefore, unconstitutional as applied to them." *Id.* at 985. But the panel majority disagreed: the concern raised by disloyalty—as opposed to a personal history of violence—couldn't "be rebutted through a showing that the individual is not, in fact, dangerous." *Id.* For an individual to argue that he enjoyed Second Amendment protections, he'd have to argue that he "enter[ed] into a relationship with the government that established the state's ability to appropriately regulate [him]"—not that he was "nonviolent" or "law-abiding." *Id.*[4]

Conversely, a defendant's "lack of relationship with the government," which gives rise to § 922(g)(5)'s prohibition, "is a product of that individual's legal standing" rather than his conduct. *Escobar-Temal*, 161 F.4th at 985. So regardless of whether Escobar-Temal was "dangerous" or "inherently peaceable," "his lack of relationship with the government as an unlawfully present individual renders it reasonable for the government to disarm him in the same way that, in 1777, it could disarm a peaceable Quaker or loyalist." *Id.*

As to the historical record, the *Escobar-Temal* majority's reliance on loyalty and danger finds support in recent decisions construing the scope of the common-law right to keep and bear arms. Founding-era governments possessed unquestioned power to disarm "dangerous" people. *Rahimi*, 602 U.S. at 694 (quoting England's Militia Act of 1662, 14 Car. 2 c. 3, § 13); *accord United States v. Williams*, 113 F.4th 637, 650 (6th Cir. 2024) ("Historical evidence demonstrates that early English kings and Parliament alike disarmed individuals they deemed dangerous."); *United States*

---

[4] *Rahimi*'s dangerousness principle applies differently to other provisions of § 922(g). *See, e.g.*, *Williams*, 113 F.4th at 661 (recognizing that the "dangerousness determinations" warranted by as-applied Second Amendment challenges to § 922(g)(1) are "individualized").

*v. Silvers*, 671 F. Supp. 3d 755, 770–74 (W.D. Ky. 2023) (similar).  These laws sometimes rested on individual characteristics and other times on "generalized determinations" that one or another "broad group"—though perhaps part of "the people"—was nevertheless dangerous.  *Williams*, 113 F.4th at 651–52.

And courts of appeals facing Second Amendment challenges to § 922(g)(5) have agreed that Congress may generally disarm aliens consistent with colonial legislatures' acknowledged power to disarm groups whose loyalty was in question. *See, e.g., United States v. Jimenez-Shilon*, 34 F.4th 1042, 1048 (11th Cir. 2022) (collecting founding-era evidence that arms-bearing "was closely associated with national fealty and membership in the body politic"); *United States v. Carbajal-Flores*, 143 F.4th 877, 885–86 (7th Cir. 2025) (describing "the embedded practice of conditioning the right to bear arms on one's loyalty to the sovereign"); *United States v. Vazquez-Ramirez*, 163 F.4th 706, 710–11 (9th Cir. 2026) (per curiam) (describing "colonial statutes [that] restricted the gun ownership of non-citizens and other individuals with questionable loyalties" and post-Revolution statutes "depriving firearms from those who refused to swear allegiance and fidelity to their respective State"); *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring in judgment) ("Those refusing to swear allegiance to their states"—or, in another case, "to the Hanoverian dynasty and to the Protestant succession"—"lacked the right to keep and bear arms"); *Kanter v. Barr*, 919 F.3d 437, 457–58 (7th Cir. 2019) (Barrett, J., dissenting) ("confiscation of guns from those who refused to swear an oath of allegiance was meant to deal with the potential threat coming from armed citizens who remained loyal to another sovereign") (quotation marks omitted).[5]

Diaz-Jarquin's motion fails for the same reason.  He concedes that he is "unlawfully present," Reply (DN 32) at 9, which precisely matches the "legal standing" of Escobar-Temal, 161 F.4th at 985 ("unlawfully present").  This proved largely dispositive for Escobar-Temal, despite his clean criminal record, consistent employment, "American citizen children," and ten-year tenure in the United States. *Id.* at 977.  Although these were among the reasons the Court of Appeals concluded that he counted among "the people" whom the Second Amendment protects, *id.* at 977–78, they failed to establish "legal standing" in the form of a "relationship with

---

[5] Of course, discriminatory laws like these would fail constitutional scrutiny today for reasons unrelated to the Second Amendment.  *See Silvers*, 671 F. Supp. 3d at 771 n.12 (citing *Kanter*, 919 F.3d at 458 n.7 (Barrett, J., dissenting)).  Nevertheless, as the Supreme Court and Sixth Circuit have recognized, they shed light on the scope of the right to keep and bear arms at the time the Second Amendment was ratified.  *See generally Escobar-Temal*, 161 F.4th at 978–81 ("These laws—as potentially fraught as many of them would be under today's standards—teach several important lessons about the Founders' conception of the right to bear arms.").

the government" sufficient to preclude his disarmament, *id.* at 985. Likewise, Diaz-Jaquin surely has "strong connections to the national community." *Id.* at 984. He's lived here for 20 years, he "attended school" and played "youth sports" in Kentucky, he works a job, and he pays taxes. Reply at 3–4. But the Sixth Circuit required more than community ties before it would place an alien unlawfully present beyond Congress' reach. *See also United States v. Huitron-Guizar*, 678 F.3d 1164, 1169–70 (10th Cir. 2012) (discussing "distinction between a 'national community' … and a 'political' one").

This doesn't mean that *no* alien unlawfully present could *ever* claim the protections of the Second Amendment from § 922(g) prosecution. *Escobar-Temal* recognized that beyond "citizenship," "the right to bear arms" could turn on "participation in the political process" or "willingness to swear allegiance to the sovereign." 161 F.4th at 982. This right, at least based on the Sixth Circuit's reading of history, was "co-extensive with various political rights," *id.* at 982, potentially including military or other government service, voting, or lawful permission to enter the country. *See id.* at 977, 979; *Jimenez-Shilon*, 34 F.4th at 1047 (citing AKHIL REED AMAR, THE BILL OF RIGHTS 48 (1998)); *Huitron-Guizar*, 678 F.3d at 1169. The situation faced by Escobar-Temal and Diaz-Jarquin says little about whether an alien who received lawful permission to enter the country but overstayed a visa, for instance, *cf.* § 922(g)(5)(B), has a different relationship with the government than someone who never had lawful status.

Diaz-Jarquin's remaining arguments are unavailing.

First, his record of lawful behavior is commendable but ultimately immaterial. Diaz-Jarquin apparently has no criminal record to speak of. He was "never … charged with a crime" until the Louisville police found guns and drugs in his home, and he avoided "gang membership." Reply at 3–4. Apart from the criminal law, he maintained car insurance and received a Kentucky driver's license. *Id.* Perhaps they would carry more weight if Diaz-Jarquin's individual threat or contribution to public safety were at issue. But as discussed above, the Sixth Circuit rejected that approach. And these facts relate, at best, to Diaz-Jarquin's relationship to the laws of Kentucky—not to any political connection with the *federal* government.

Second, those documented connections that *do* relate to the federal government are nevertheless inapposite under Sixth Circuit law and historical precedent. True, Diaz-Jarquin's social security number and federal work permit—in contrast to his state-government contacts—may "represen[t] a formal, documented interaction with the federal … government." *Id.* at 4. But many of the Quakers, Catholics, Native Americans, and loyalists disarmed by colonial legislatures surely had incidental regulatory contact with colonial governments as well. Just not contacts that carried with them a right to possess weapons. To follow the Sixth Circuit's reasoning, those

6

connections didn't "establis[h] the state's ability to appropriately regulate" these groups in a manner sufficient to confer Second Amendment protection. *Escobar-Temal*, 161 F.4th at 985. So too for Diaz-Jarquin. He may be "known to the government," but he does not—any more than the Catholics, Quakers, Native Americans, and loyalists of the late 18th century—"recogniz[e] its authority." *Id.* at 982.

Third, Diaz-Jarquin argues that his deferred removal under the DACA policy gives him a different legal status than Escobar-Temal. DACA, he argues, gave him "permission … to remain in the United States." Motion to Dismiss at 2–3. And this permission-after-application makes him "analogous to" someone who "*did* swear allegiance" and could therefore bear arms. Reply at 8.

But nothing in the record indicates that Diaz-Jarquin *did* swear allegiance to this country. And his characterization of DACA enrollment as "the modern equivalent of the historical loyalty oaths" proves too much. Catholics, Quakers, Native Americans, and loyalists had relationships with the government, too. They worked, paid taxes, and in some cases received government benefits. These were not "*sufficient* connection[s] to the sovereign government to provide that government confidence in its ability to regulate the group's conduct with guns." *Escobar-Temal*, 161 F.4th at 981 (emphasis added). And precedent forecloses the notion that an executive order and administrative re-designation can alter a statute's reach. At least not for a statute that nowhere delegates such discretion to the Executive. Precedent likewise forecloses the suggestion that DACA enrollment changes the legal status created by congressional statutes regulating immigration. The Sixth Circuit has previously held that the Homeland Security "Secretary's grant of deferred action under DACA … did not—and could not—change [Diaz-Jarquin's] status as an alien 'illegally or unlawfully in the United States.'" *United States v. Lopez*, 929 F.3d 783, 786–87 (6th Cir. 2019) (quoting § 922(g)(5)). "Instead that relief represented only the Secretary's decision temporarily not to prosecute him for that status." *Id.*

Given that lack of a change in statutory status, does DACA's administrative pledge not to enforce the removal laws sweep Diaz-Jarquin within the Second Amendment's protection? DACA's nonprosecution decision was "formal," to be sure. Reply at 5 (quoting *Escobar-Temal*, 161 F.4th at 983). It's memorialized in and contingent on an application filed with the Secretary and "renew[ed] … every two years." Motion to Dismiss at 3.

However recorded, this Executive Branch policy doesn't "confe[r]" any "substantive right" or change anyone's statutory "immigration status." *Lopez*, 929 F.3d at 786 (quotation omitted). Just as executive determinations (absent delegation) cannot alter a statute's scope, executive forbearance cannot erase a criminal prohibition. *Cf.* Zachary Price, *Reliance on Nonenforcement*, 58 WM. & MARY L. REV.

937, 964 (2017) (arguing that executive promises of nonenforcement generally confer no legal reliance interests). And *Lopez* squarely held that an Executive Branch decision to defer removal doesn't change that. "Only the Congress, acting through its legislative authority, can confer these rights." *Lopez*, 929 F.3d at 786 (quotation omitted). The Executive Branch's decision, based on its Article II authority, not to authorize prosecution of one law passed by Congress cannot possibly limit Congress' authority (and almost certainly not a subsequent Administration's decision) to facilitate the Executive's prosecution of another law. "[T]he Executive Branch has exclusive authority and absolute discretion to decide which crimes to investigate and prosecute." *Trump v. United States*, 603 U.S. 593, 620 (2024) (quotation marks omitted); *see also United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file … are decisions that generally rest in the prosecutor's discretion.").

As the majority and concurring opinions in *Escobar-Temal* observe, ample historical evidence confirms that founding-era legislatures here and abroad disarmed groups with attenuated or suspect connections to the legal regime. Without any discernible political connection to this country, Diaz-Jarquin may be disarmed by Congress consistent with that tradition. The federal statute under which he was indicted made clear that persons without lawful authorization to remain in this country are not allowed to possess weapons. § 922(g)(5). Diaz-Jarquin nevertheless possessed several weapons. That a prior Government program protected him from removal from the country does not imply that the same Government could not later punish him for breaking a criminal law while he remained here.

## ORDER

During a prior hearing, the Court orally denied Diaz-Jarquin's motion to dismiss the indictment (DN 14). This opinion further explains and memorializes that decision. Diaz-Jarquin has decided to plead guilty to this offense subject to preservation of his right to challenge this ruling.

Benjamin Beaton, District Judge
United States District Court

June 2, 2026

8